# IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

|  |  |
|---|---|
| KEVIN SWAIN, | CASE NO. 5:21-cv-01542 |
| Plaintiff, | DISTRICT JUDGE SARA LIOI |
| vs. | MAGISTRATE JUDGE AMANDA M. KNAPP |
| COMMISSIONER OF SOCIAL SECURITY, | **REPORT AND RECOMMENDATION** |
| Defendant. | |

Plaintiff Kevin Swain ("Plaintiff" or "Mr. Swain") files *pro se* seeking judicial review of the final decision of Defendant Commissioner of Social Security ("Commissioner") denying his applications for Disability Insurance Benefits (DIB) and Supplemental Security Income (SSI). (ECF Doc. 1.)  This Court has jurisdiction pursuant to 42 U.S.C. § 405(g).  This matter has been referred to the undersigned Magistrate Judge for a Report and Recommendation pursuant to Local Rule 72.2.

For the reasons set forth below, the undersigned recommends that the Court **AFFIRM** the Commissioner's decision.

## I.    Procedural History

Mr. Swain filed his applications for DIB and SSI on April 14, 2017.  (Tr. 168, 169, 364-72, 373-74.)  He asserted a disability onset date of August 22, 2016.  (Tr. 117, 364, 373.)  He alleged disability due to high blood pressure, hyperthyroid, keratoconus of both eyes with need for or having had corneal transplant, and depression.  (Tr. 117, 227, 234, 421.)

Following a state agency medical consultant's finding that Mr. Swain's vision impairments met Listing 2.02, the State agency made an initial determination that he met the criteria for disability based on statutory blindness.  (Tr. 123, 127, 136, 140, 432.)  A quality review process was then initiated, and a new medical consultant opined that the documented visual acuity in Mr. Swain's left eye was inconsistent with statutory blindness, and that Mr. Swain's vision impairments were non-severe as of twelve months after the alleged onset date ("AOD").  (Tr. 123-24.)  The state agency took a corrective action based on this finding, and directed that Mr. Swain's disability paperwork be revised to reflect that all impairments were non-severe as of twelve months post-AOD.  (Tr. 432-33.)  His claim was denied initially based on this revised determination (Tr. 162, 168-69, 227-31) and on reconsideration (Tr. 194-95, 232, 234-40, 241-45, 246).  Mr. Swain then requested a hearing.  (Tr. 247-48.)

A hearing was held before an Administrative Law Judge ("ALJ") on May 16, 2019 (Tr. 28-81.)  On July 3, 2019, the ALJ issued an unfavorable decision.  (Tr. 196-217.)  Following Mr. Swain's first request for review, the Appeals Council remanded the matter due to the ALJ's failure to evaluate the psychological consultative examiner's opinion and failure to include the psychiatric consultative examination report in the record.  (Tr. 10, 218-21.)  On September 17, 2020, the ALJ held a second hearing.  (Tr. 82-115.)  On October 29, 2020, the ALJ issued an unfavorable decision, finding Mr. Swain was not under a disability within the meaning of the Social Security Act from August 22, 2016 through the date of the decision.  (Tr. 7-27.)  On June 14, 2021, the Appeals Council denied Mr. Swain's second request for review, making the ALJ's October 29, 2020 decision the final decision of the Commissioner.  (Tr. 1-6.)

## II.      Evidence

While the ALJ identified numerous impairments in her decision (Tr. 13), Mr. Swain's

arguments on appeal focus on his vision impairments (*see* ECF Doc. 1 p. 4; ECF Doc. 9 pp. 1-2).

The evidence summarized herein accordingly focuses on those impairments.  Although Mr.

Swain did not identify specific record evidence in support of his arguments, as required by the

Initial Order in this case, the undersigned has independently reviewed the certified administrative

record filed by the Commissioner (ECF Doc. 7) in light of Mr. Swain's *pro se* status.

### A.      Personal, Educational, and Vocational Evidence

Mr. Swain was born in 1990 and was 25 years old at the alleged onset date.  (Tr. 18, 38,

88.)  He graduated from high school and attended college in 2012 but did not earn a degree.  (Tr.

38, 91-92.)  He lived with his parents.  (Tr. 33, 88-89.)  His work history included various full-

time positions, including working on an assembly-line, as a driver porter at a car dealership, as a

tech support agent, as a pie maker in a pie factory, as a customer service and delivery agent for

household items, and as a salvager at a junkyard facility.  (Tr. 35-37, 39-46, 92-93.)

### B.      Medical Evidence

#### 1.      Treatment History During Relevant Period

On June 30, 2016, Mr. Swain presented to Thomas M. Chester, O.D. at the Cleveland

Eye Clinic as a new patient with complaints of blurred vision in both eyes, worse in the left, that

had been occurring for three months.  (Tr. 603-04.)  Corneal topography showed irregular

astigmatism in both eyes and Mr. Swain was diagnosed with keratoconus in both eyes.  (Tr. 603.)

Dr. Chester discussed contact lenses as an option.  (*Id*.)  Mr. Swain was not interested in contact

lenses, but expressed interest in surgical options.  (*Id*.)

On August 17, 2016, Mr. Swain presented to ophthalmologist Scott A. Wagenberg, M.D., reporting that he had been diagnosed with keratoconus in both eyes, greater on the left.  (Tr. 556.)  Mr. Swain reported that his vision had been declining over the past few years, with intermittent light sensitivity and irritation in his left eye.  (*Id*.)  He reported using artificial tears and wearing a RGP (rigid gas permeable) lens on his right eye.  (*Id*.)  A Snellen visual acuity examination showed that Mr. Swain's distance vision was 20/150 on the right and 20/250 on the left without correction.  (*Id*.)  His visual fields were full on the left and right.  (Tr. 557.)  A Slit Lamp examination showed mild-moderate keratoconus in the right cornea and severe keratoconus with apical scarring in the left cornea.  (*Id*.)  Dr. Wagenberg diagnosed keratoconus in both eyes, with advanced keratoconus with atypical scarring in the left eye that could not be treated with contact lenses.  (Tr. 558.)  He scheduled Mr. Swain for deep anterior lamellar keratoplasty (corneal transplant) surgery.  (*Id*.)

On September 27, 2016, Mr. Swain had corneal transplant surgery on his left eye.  (Tr. 585-86.)  At a post-op appointment the next day, he reported that his left eye was tearing a lot, but not painful.  (Tr. 560.)  His visual acuity examination showed that his vision in the left eye was 20/60-2 without correction.  (Tr. 561.)  Dr. Wagenberg observed that a contact lens was in place in the left eye and the sutures were intact.  (*Id*.)  He prescribed eye drops and advised Mr. Swain to wear an eye shield at night and not to rub his eye.  (*Id.*)

Mr. Swain returned for post-op follow up on October 6, 2016, reporting that the contact lens fell out two days after insertion, but that his left eye felt okay.  (Tr. 563.)  A visual acuity examination showed his uncorrected vision was 20/250 in the left eye.  (*Id*.)  On examination, Dr. Wagenberg observed a well-attached graft with sutures in place.  (Tr. 564.)  He instructed Mr. Swain to continue to use his eye drops.  (*Id*.)

During a November 7, 2016 follow-up visit, Mr. Swain reported that he ran out of one of his drops the prior week.  (Tr. 616.)  A refill was provided and he was advised against abruptly stopping use of drops.  (*Id*.)  He was instructed to call the office if he ran out again.  (*Id*.)

On December 8, 2016, Mr. Swain returned to Dr. Wagenberg for further post-op follow up.  (Tr. 570.)   He reported no blurred vision but a possible sty on his upper left eyelid that he noticed the day before.  (*Id*.)  A visual acuity examination showed that Mr. Swain's vision was 20/70- in the left eye without correction.  (Tr. 571.)   Dr. Wagenberg removed some sutures and continued to prescribe eye drops.  (Tr. 571-72.)

At a follow-up appointment on January 25, 2017, Mr. Swain reported that his vision was doing well and he noticed improvement.  (Tr. 574.)  He reported blurriness, but mostly in the morning, relating that it took him some time to focus.  (*Id*.)  He denied eye pain or discomfort.  (*Id*.)  A visual acuity examination showed his uncorrected vision was 20/100 in the left eye.  (Tr. 575.)  Dr. Wagenberg removed additional sutures and instructed Mr. Swain to continue to use his eye drops as directed.  (Tr. 576.)

When Mr. Swain returned to Dr. Wagenberg for follow up on February 27, 2017, he reported he was doing well with no problems or decreased vision over the prior month.  (Tr. 578.)  A visual acuity examination showed his uncorrected vision remained 20/100 in the left eye.  (Tr. 579.)   Dr. Wagenberg noted that Mr. Swain was doing well, with a great decrease in astigmatism.  (Tr. 579-80.)  He removed additional sutures and instructed Mr. Swain to continue to use his eye drops as directed.  (*Id*.)

Mr. Swain returned to see Dr. Wagenberg on March 8, 2017 for Manifest Refraction of the left eye, and to discuss the right eye.  (Tr. 582-83.)  Manifest Refraction testing showed

20/25 distance vision in the left eye with correction.  (Tr. 583.)  Dr. Wagenberg recommended

corneal transplant of the right eye to address the mild-moderate keratoconus in that eye.  (*Id*.)

On March 9, 2017, Mr. Swain called Dr. Wagenberg's office requesting a letter stating he

could drive a tow motor.  (Tr. 614.)  The letter was provided per Mr. Swain's request.  (*Id*.)  Mr.

Swain returned to Dr. Wagenberg on April 27, 2017, and Dr. Wagenberg recommended corneal

transplant of the right eye.  (Tr. 613-14.)  Mr. Swain indicated he would call when he was ready

to proceed.  (Tr. 613.)

On March 20, 2018, Mr. Swain underwent corneal transplant of the right eye.  (Tr. 644-

50.)  He returned to Dr. Wagenberg for a post-op follow up the next day, reporting tearing and

tenderness to touch but no pain.  (Tr. 702.)  His visual acuity examination showed his

uncorrected vision was 20/150 in the right eye.  (Tr. 703.)  Dr. Wagenberg prescribed eye drops

to be used as directed.  (Tr. 704.)

On March 23, 2018, Mr. Swain returned to Dr. Wagenberg for a follow up, reporting

tearing, photophobia, and throbbing pain.  (Tr. 706.)  His visual acuity examination again

showed his uncorrected vision was 20/150 in the right eye. (Tr. 708.)  Dr. Wagenberg instructed

Mr. Swain regarding the use of his eye drops.  (Tr. 709.)

Mr. Swain returned to Dr. Wagenberg on April 2, 2018, reporting that his visual acuity in

the right eye seemed to be getting better.  (Tr. 711.)  His visual acuity examination showed his

uncorrected vision was 20/200 in the right eye and 20/40 in the left.  (Tr. 712.)  His visual fields

in both eyes were full.  (Tr. 713.)  Dr. Wagenberg noted borderline intraocular pressure in the

right eye, and recommended the addition of glaucoma drops if there was no improvement in a

week.  (*Id*.)

Mr. Swain returned to Dr. Wagenberg on April 9, 2018, reporting that he still had light sensitivity and mild pain, and that his vision remained the same.  (Tr. 716.)  On examination, his uncorrected vision was 20/400 in the right eye.  (Tr. 717.)  Dr. Wagenberg noted a partial detachment of the graft with corneal abrasion.  (Tr. 718.)  If there was no improvement, Dr. Wagenberg indicated that a regraft would be considered.  (*Id.*)

Mr. Swain returned to Dr. Wagenberg on April 18, 2018, stating that his vision was still blurred and had not improved since his last visit.  (Tr. 720.)  His uncorrected vision was 20/500 in the right eye.  (Tr. 721.)  Dr. Wagenberg indicated that there was elevated intraocular pressure in the right eye with corneal edema secondary to primary graft failure in the right eye.  (Tr. 722.)  He again instructed Mr. Swain on use of his eye drops.  (*Id.*)

When Mr. Swain returned to Dr. Wagenberg on May 2, 2018, his uncorrected vision was 20/400 in the right eye, and his visual field was very blurry in the right eye.  (Tr. 726.)  His intraocular pressure in the right eye was too high, and he was diagnosed with a primary graft failure of the right eye with a recommendation to repeat the graft.  (Tr. 727.)  Dr. Wagenberg noted that Mr. Swain had stopped taking one of his eye drops but planned to restart it.  (*Id.*)

On May 15, 2018, Mr. Swain underwent a repeat corneal transplant of the right eye.  (Tr. 742-43.)  At his post-op follow up the next day, Mr. Swain reported he was doing okay.  (Tr. 804.)  His uncorrected vision was 20/100 in the right eye.  (Tr. 805.)  Dr. Wagenberg prescribed eye drops.  (Tr. 806.)  The following week, on May 23, 2018, his uncorrected vision was 20/150 in the right eye.  (Tr. 809.)  His intraocular pressure was elevated without evidence of defect.  (Tr. 810.)  Mr. Swain was instructed on use of his eye drops.  (*Id.*)

During a June 4, 2018 follow-up visit with Dr. Wagenberg, Mr. Swain's uncorrected vision was 20/80-1 in the right eye and 20/50 in the left.  (Tr. 814.)  Dr. Wagenberg indicated

that Mr. Swain was doing well, except for elevated intraocular pressure in the right eye.  (Tr. 815.)  He prescribed eye drops for both eyes.  (*Id*.)

Mr. Swain returned to Dr. Wagenberg on July 3, 2018, reporting that he ran out of Combigan drops the prior week, and that his right eye had been very irritated and painful since that time.  (Tr. 818.)  He reported that his right eye was intermittently blurry with redness, itching, and tearing.  (*Id*.)  He had presented to the emergency room the day before, but had not been provided with drops.  (*Id*.)  On examination, his uncorrected vision was 20/300 in the right eye and 20/40+1 in the left.  (Tr. 820.)  His visual fields were full.  (*Id*.)  Dr. Wagenberg prescribed drops for both eyes and noted that Mr. Swain's intraocular pressure was very high.  (Tr. 821.)  Mr. Swain was instructed on the importance of compliance.  (*Id*.)

When Mr. Swain saw Dr. Wagenberg on July 6, 2018, his uncorrected vision was 20/150 in the right eye and 20/30 in the left.  (Tr. 825.)  His intraocular pressure remained elevated.  (Tr. 826.)  Dr. Wagenberg performed a small procedure to "cut out kenalog from conjunctiva" in the office.  (*Id*.)  He provided instructions for use of drops in both eyes.  (*Id*.)

Mr. Swain returned to Dr. Wagenberg on July 23, 2018.  (Tr. 829.)  His uncorrected vision was 20/125-1 in the right eye and 20/30 in the left.  (Tr. 831.)  Dr. Wagenberg diagnosed open-angle glaucoma, bilateral, mild stage.  (*Id*.)  He indicated that Mr. Swain's intraocular pressure was too high, and noted that Mr. Swain reported not taking his medication that day. (*Id*.)  Dr. Wagenberg advised him to take his medication in the morning before appointments. (*Id*.)

At a follow up on with Dr. Wagenberg on August 15, 2018, Mr. Swain's intraocular pressure was too high and he was advised to see a glaucoma specialist as soon as possible.  (Tr. 838.)  His uncorrected vision was 20/400 in the right eye and 20/40-2 in the left.  (Tr. 837.)  Dr.

8

Wagenberg noted that Mr. Swain had not used his drops that day.  (Tr. 838.)  Mr. Swain was again advised of the importance of remaining compliant with his medication and plan of care "because damage can be done that cannot be fixed."  (*Id*.)  Mr. Swain was instructed to call the office to get a prescription for another medication if a prescribed medication was determined to be too expensive.  (*Id*.)  Mr. Swain's mother expressed concern that her son's intraocular pressure was elevated because he was working, but Dr. Wagenberg explained that the elevated pressure was unrelated to working.  (*Id*.)

On August 17, 2018, Mr. Swain attended a glaucoma evaluation with Edward J. Rockwood, M.D., an ophthalmologist at the Cleveland Clinic.  (Tr. 910.)  A visual acuity examination showed his uncorrected vision was 20/300 in the right eye and 20/60 in the left.  (Tr. 912.)  Dr. Rockwood suspected glaucoma and pigment dispersion syndrome in both eyes.  (Tr. 914.)

Mr. Swain returned to Dr. Wagenberg on August 24, 2018 for follow up regarding his open angle glaucoma.  (Tr. 841.)  His uncorrected vision was 20/500 in the right eye and 20/30 in the left.  (Tr. 843.)  His intraocular pressure was too high, but he had not used his glaucoma drops despite being instructed on the importance of doing so.  (Tr. 844.)  At a follow up on August 29, 2018, his uncorrected vision was 20/400 in the right eye and 20/40 in the left.  (Tr. 847.)  Dr. Wagenberg indicated that his intraocular pressure was much improved in the right eye, noting that he took all his medication that morning.  (Tr. 848.)  Dr. Wagenberg continued Mr. Swain on the same medications with instructions to follow up in a month.  (*Id*.)

Mr. Swain returned to Dr. Wagenberg on September 28, 2018.  (Tr. 850.)  His uncorrected vision was 20/400 in the right eye and 20/25 in the left.  (Tr. 851.)  His intraocular

pressure was noted to be too high.  (Tr. 852.)  Dr. Wagenberg reduced the frequency of one of Mr. Swain's drops and instructed him to follow up with Dr. Eisengart.  (*Id*.)

On October 3, 2018, Dr. Wagenberg's ophthalmic assistant Callie Antonelli spoke with Mr. Swain's mother regarding Mr. Swain not showing for an appointment the day before.  (Tr. 1256.)  Mr. Swain's mother relayed that he did not come because of insurance issues.  (*Id*.)  Ms. Antonelli informed his mother that he had been told to come in and speak to a financial counselor, and that he would still be seen.  (*Id*.)  Ms. Antonelli noted that the patient was again advised about the risks of not taking medication or not following up.  (*Id*.)  That same day, Mr. Swain saw Jonathan Eisengart, M.D., an ophthalmologist at the Cleveland Clinic for pain, redness, and blurred vision in the right eye.  (Tr. 917.)  He reported using his drops as instructed. (*Id*.)  A visual acuity examination showed his uncorrected vision was 20/200 in the right eye and 20/30 in the left.  (Tr. 919.)  Dr. Eisengart recommended BGI (tube) surgery to address his glaucoma.  (Tr. 920.)  Office notes indicate that "[a] Baerveldt tube-shunt is a glaucoma drainage device that is surgically implanted to lower the pressure within the eye (intraocular pressure) for the treatment of glaucoma."  (Tr. 921.)

On October 25, 2018, Dr. Eisengart performed a 350-mm Baerveldt glaucoma implant with scleral graft in Mr. Swain's right eye.  (Tr. 970-72.)  During a post-op follow up the next day, a visual acuity examination showed his uncorrected vision was 20/80+1 in the right eye and 20/25+1 in the left.  (Tr. 932.)  His intraocular pressure had improved "just a bit."  (Tr. 933.)  Dr. Wagenberg noted that "interestingly, [his] [visual acuity] seemed to have improved."  (*Id*.)

Mr. Swain followed up with Dr. Eisengart on November 2, 2018, reporting that his right eye had been blurry and he was keeping it closed a lot.  (Tr. 936.)  He also reported that he ran

out of one of his drops and had not used the medication for two days.  (*Id*.)  His uncorrected vision was 20/300 in the right eye and 20/25-1 in the left.  (Tr. 937.)

On November 28, 2018, Mr. Swain returned to Dr. Eisengart for another follow up.  (Tr. 946.)  Dr. Eisengart indicated that Mr. Swain's intraocular pressure had improved, but that his tube was still not open and his cornea was decompensating.  (Tr. 948.)  Dr. Eisengart opened the tube and noted that Mr. Swain would return to see Dr. Wagenberg regarding concern over corneal decompensation.  (Tr. 948.)  Dr. Eisenberg noted a little intraocular pressure in the left eye and advised Mr. Swain to use one of the eye drops prescribed for the right eye in both eyes. (*Id*.)

Mr. Swain returned to Dr. Wagenberg on December 13, 2018, complaining that his right eye vision was still blurry and he still had redness.  (Tr. 855.)  He reported compliance with his eye drops.  (*Id*.)  Dr. Wagenberg was not certain whether the problem was rejection or failure of the corneal graft.  (Tr. 857.)  He administered a kenalog injection since Mr. Swain reported that Prednisolone drops were helping his cornea.  (*Id*.)

Mr. Swain returned to Dr. Eisengart on January 8, 2019, complaining of irritation in the right eye and saying he felt like something was in his eye or a stitch had fallen out.  (Tr. 951.) His uncorrected vision was 20/300 in the right eye and 20/25-2+1 in the left.  (Tr. 952.)  The intraocular pressure in the left eye was very high.  (Tr. 954.)  Dr. Eisengart instructed him to use additional drops in the left eye.  (*Id*.)

On January 9, 2019, Mr. Swain saw Dr. Wagenberg for follow up regarding his cornea transplant.  (Tr. 859.)  His visual acuity examination showed his uncorrected vision was 20/300 in the right eye and 20/30 in the left.  (Tr. 860.)  The intraocular pressure in the left eye was too

high, so Diamox (acetazolamide) pills were prescribed.  (Tr. 861.)  His right eye rejection was improving, but there was still edema.  (*Id*.)

Mr. Swain returned to Dr. Wagenberg on January 24, 2019, reporting that he still had some irritation, but his vision was getting better, with no redness, itching, flashes, or floaters.  (Tr. 864.)  His uncorrected vision was 20/150 in the right eye and 20/40+1 in the left.  (Tr. 865.)

At a February 26, 2019 appointment with Dr. Eisengart, Mr. Swain reported that some days were better than others.  (Tr. 957.)  His uncorrected vision was 20/250 in the right eye and 20/30 in the left.  (Tr. 958.)  Mr. Swain reported that that he was out of his oral medication – acetazolamide.  (Tr. 960.)  His intraocular pressure was high and Dr. Eisengart recommended Baerveldt tube surgery in the left eye.  (*Id*.)  Even if starting back on acetazolamide helped lower his intraocular pressure, Dr. Eisengart indicated that "keeping him on 4 topical meds, restricting steroid exposure, and oral acetazolamide is not a good long-term solution."  (*Id*.)

Mr. Swain returned to Dr. Wagenberg the next day.  (Tr. 867.)  His uncorrected vision was 20/250 in the right eye and 20/30+2 in the left.  (Tr. 870.)  Mr. Swain had not yet started taking Diamox, stating the medication was not ready the day before, but that he planned to pick it up that day.  (Tr. 868, 871.)  Dr. Wagenberg removed some sutures from the right eye.  (Tr. 871.)

Mr. Swain saw Dr. Wagenberg again on April 3, 2019.  (Tr. 987.)  His uncorrected vision was 20/250 in the right eye and 20/25-1 in the left.  (Tr. 988.)  Dr. Wagenberg noted that the corneal transplants were doing well in both eyes.  (Tr. 989.)  Sutures were removed from the right eye.  (*Id*.)

On April 4, 2019, Mr. Swain underwent 350-mm Baerveldt glaucoma implant with scleral graft surgery in the left eye.  (Tr. 999-1001.)  At a post-op follow up on April 10, 2019,

Mr. Swain's uncorrected vision was 20/150 in the right eye and 20/40 in the left.  (Tr. 1047.)
The record indicates that the examination tested his vision without correction ("Dist sc").  (*Id*.)
However, the following notation was added: "Correction: Glasses."  (*Id*.)  Thus, it is unclear
whether the visual acuity results from this date documented Mr. Swain's corrected or
uncorrected vision.

Mr. Swain returned to Dr. Eisengart on April 19, 2019.  (Tr. 1051.)  He reported that he
forgot to use one of his drops that morning.  (*Id*.)  He reported no vision changes since his last
visit.  (*Id*.)  His visual acuity examination showed his vision was 20/200 in the right eye and
20/40-1 in the left. (Tr. 1052.)  The record indicates that the examination tested his vision
without correction ("Dist sc").  (*Id*.)  However, the following notation was again added:
"Correction: Glasses."  (*Id*.)  Thus, it is unclear whether the visual acuity results from this date
documented Mr. Swain's corrected or uncorrected vision.

On April 20, 2019, Mr. Swain reported to Dr. Eisengart that his right eye was irritated
and both eyes were very blurry upon waking.  (Tr. 1056.)  His uncorrected vision was 20/100 in
the right eye and 20/30-2 in the left.  (*Id*.)

Mr. Swain returned to Dr. Eisengart on May 7, 2019.  (Tr. 1061.)  His uncorrected vision
was 20/150 in the right eye and 20/30-1+2 in the left.  (*Id*.)  Dr. Eisengart observed that the
pressure in Mr. Swain's left eye fluctuated during the examination.  (*Id*.)

On May 17, 2019, Mr. Swain returned for follow up with Dr. Wagenberg.  (Tr. 1065.)
Dr. Wagenberg removed loose sutures from the right eye.  (*Id*.)  Mr. Swain reported his vision
had improved and he had no eye pain or discomfort.  (*Id*.)  He stated he was applying for
disability.  (*Id*.)  His visual acuity examination showed his uncorrected vision was 20/150 in the
right eye and 20/30- in the left.  (Tr. 1066.)  His intraocular pressure was doing well.  (Tr. 1067.)

Mr. Swain saw Dr. Eisengart on June 11, 2019.  (Tr. 1070.)  His uncorrected vision was 20/150 in the right eye and 20/30+3 in the left.  (Tr. 1071.)  During his appointment with Dr. Wagenberg a few days later, his uncorrected vision was 20/100 in the right eye and 20/20-2 in the left eye, and his intraocular pressure was doing well in both eyes.  (Tr. 1076, 1077.)  Dr. Wagenberg noted the possible need for cataract extraction.  (Tr. 1077.)

Mr. Swain returned for follow up with Dr. Eisengart on July 9, 2019.  (Tr. 1081.) His uncorrected vision was 20/150 in the right eye and 20/40 in the left.  (*Id*.)

During a July 12, 2019 appointment with Dr. Wagenberg, Mr. Swain reported no changes in his visual acuity and no pain or discomfort.  (Tr. 1085.)  He reported using his drops as prescribed.  (*Id*.)  His uncorrected vision was 20/125 in the right eye and 20/30+2 in the left.  (Tr. 1086.)  Dr. Wagenberg made a new diagnosis of nuclear senile cataract of the right eye.  (Tr. 1087.)  Mr. Swain reported that the decline in his vision from the cataract impeded his ability to drive and engage in other activities, and that he was no longer able to function adequately on a day-to-day basis due to his visual condition.  (*Id*.)  Dr. Wagenberg stated it was his opinion that the "cataract [was] the primary cause, or at least a significantly contributory cause of [Mr. Swain's] visual dysfunction" and "[w]ith uncomplicated [right eye] cataract surgery and lens implantation, it [was] [his] expectation that [Mr. Swain's] visual function and quality of life will improve, significantly."  (*Id*.)

On September 24, 2019, Mr. Swain had cataract surgery with intraocular lens in the right eye.  (Tr. 1102-03.)  Mr. Swain returned to Dr. Wagenberg for a post-op follow up on October 3, 2019.  (Tr. 1152.)  He was doing well and his visual acuity examination showed his uncorrected vision was 20/80- in the right eye.  (Tr. 1153.)  During an October 8, 2019 follow-up visit with

Dr. Eisengart, Mr. Swain's uncorrected vision was 20/100-1 in the right eye and 20/40+2 in the left eye, with a full visual field in the left eye. (Tr. 1157.)

On November 6, 2019, Mr. Swain's uncorrected vision was 20/125 in the right eye and 20/40 in the left. (Tr. 1163.) His intraocular pressure was doing well. (Tr. 1164.) On December 12, 2019, Mr. Swain reported to Dr. Wagenberg that he was doing well, and his visual acuity examination showed his uncorrected vision was 20/200 in the right eye and 20/25-3 in the left eye. (Tr. 1167.) His intraocular pressure was doing well. (Tr. 1168.)

On January 7, 2020, Mr. Swain presented for a contact lens evaluation at the Cleveland Clinic with Lindsey Foster, O.D. (Tr. 1170.) His uncorrected vision was 20/80-1 in the right eye and 20/25-1 in the left. (Tr. 1171.) His visual fields were full. (*Id*.) Trial contacts were ordered. (Tr. 1172.)

On January 15, 2020, Mr. Swain returned to Dr. Eisengart. (Tr. 1174.) His uncorrected vision was 20/80-1 in the right eye and 20/30-1 in the left eye. (Tr. 1175.) Dr. Eisengart noted that his intraocular pressure was excellent with medication. (Tr. 1176.) He also observed that the tube in Mr. Swain's right eye was somewhat anterior, and that he would attempt to reposition it if advised by Dr. Wagenberg to do so. (*Id*.)

Mr. Swain returned to Dr. Foster for contact lens follow up on February 12, 2020. (Tr. 1207.) His visual acuity examination showed his corrected vision (with contacts) was 20/30 in the right eye, and that his visual fields were full. (Tr. 1208.) Dr. Foster indicated that the contacts provided "excellent visual acuity and fit" and stated "[a]t this point, visual acuity is stable and functional." (Tr. 1209.) She recommended that he try the contacts for two weeks before filling the prescription. (*Id*.)

Mr. Swain returned to Dr. Eisengart on May 20, 2020.  (Tr. 1211.)  He reported that it seemed like his right eye was "getting better but ha[d] it's days," and his left eye was "good," but that his vision overall got "blurry from time to time."  (*Id*.)  He denied flashes, floaters, or sudden vision loss.  (*Id*.)  His uncorrected vision was 20/100-1 in the right eye and 20/30+1 in the left, and his visual fields were full.  (Tr. 1212.)

### 2.       Evidence Submitted After ALJ Decision

Mr. Swain attached various documents to his filings in this case, some of which were evidently copies of records from the underlying administrative proceedings, but others of which were clearly newly submitted evidence that was not before the ALJ at the time she issued her opinion.  (*See, e.g.,* ECF Doc 1-2 pp. 1-13, ECF Doc 9-1 pp. 1-2, ECF Doc 9-2 pp. 1-54, ECF Doc 10-1 pp. 1-2, ECF Doc. 12).  Any evidence that was not included in the administrative record before the ALJ at the time of her decision can only be considered in the context of a request for a sentence six remand, and therefore will not be summarized here.  *See Cline v. Comm'r of Soc. Sec.*, 96 F.3d 146, 148 (6th Cir. 1996) ("[W]here the Appeals Council considers new evidence but declines to review a claimant's application for disability insurance benefits on the merits, the district court cannot consider that new evidence in deciding whether to uphold, modify, or reverse the ALJ's decision," and can only consider it as the basis for a sentence six remand.).  This evidence will be addressed only in Section VI.C., *infra*.

### 3.       Opinion Evidence

#### i.       Treating Source

Summarized below are letters authored by Dr. Wagenberg concerning Mr. Swain's treatment during the relevant period.  Dr. Wagenberg also completed the Speech Sense (Eye) Residual Functional Capacity Questionnaire, which is also detailed below.

On August 24, 2018, Dr. Wagenberg explained that Mr. Swain had "glaucoma associated with his last Pentrating keratoplasty in the right eye" which had caused "depression secondary to the medications and poor vision he ha[d] in the right eye."  (Tr. 633.)

On October 3, 2018, Dr. Wagenberg explained that Mr. Swain was in need of urgent right eye surgery, to be performed in the next two or three weeks, and that he would be restricted from bending and lifting more than ten pounds for approximately two or three weeks following his surgery.  (Tr. 634.)

On January 9, 2019, Dr. Wagenberg explained that Mr. Swain was seen "for corneal rejection of the right eye which might require a repeat corneal transplant."  (Tr. 631.)  He also explained that Mr. Swain was started on a new medication for treatment of uncontrolled glaucoma in the left eye.  (*Id*.)

On February 26 and 27, 2019, Dr. Wagenberg again explained that Mr. Swain was seen "for corneal rejection of the right eye which might require a repeat corneal transplant."  (Tr. 632.)  He also explained that Mr. Swain needed to treat the uncontrolled glaucoma in the left eye and would "be unable to work until [it] [was] completed."  (Tr. 632, 635.)

On April 11, 2019, Dr. Wagenberg completed a Special Sense (Eye) Residual Functional Capacity Questionnaire, listing diagnoses of status post corneal transplant and primary open angle glaucoma.  (Tr. 908.).  Dr. Wagenberg stated that Mr. Swain would always need follow up, eventually every three to six months but at that time he needed weekly follow up due to surgery.  (*Id*.)  He stated that Mr. Swain's best corrected vision was 20/250 in his right eye and 20/25-1 in his left eye, based on an April 3, 2019 examination. (*Id*.)  He noted that Mr. Swain had fluctuating vision in the right eye.  (*Id*.)  There were no noted precipitating factors.  (*Id*.)  Dr. Wagenberg listed Mr. Swain's medications and checked boxes indicating that he was not

compliant with taking medication, that he would not need any special accommodations due to his vision, and that he would not need to take unscheduled breaks.  (Tr. 908-09.)  Dr. Wagenberg did indicate that Mr. Swain's impairments would cause "good days" and "bad days," that he would likely be absent from work about once a month, and that his limited / poor vision would affect his daily activity or ability to work on a sustained basis.  (Tr. 909.)

### ii.     Consultative Examiner

On August 11, 2017, Mary File, M.D. completed an ophthalmological / optometric consultative examination.  (Tr. 607-11.)  Dr. File found that Mr. Swain's visual acuity without glasses was 20/400+1 in the right eye and 20/50-2 in the left eye, while his best corrected vision was 20/400+1 in the right eye and 20/40+1 in the left eye.  (Tr. 607.)  Dr. File found that his visual fields were normal and listed the following diagnoses: keratoconus and keratoconus s/p anterior lamellar keratoplasty.  (Tr. 608.)  Dr. File stated Mr. Swain was doing well post-operatively with respect to the surgery on his left eye, and that he would need an anterior lamellar keratoplasty on his right eye in the future.  (*Id.*)  Dr. File opined that he "should not drive at nite [sic], climb heights or operate heavy machinery" due to his visual impairment.  (*Id.*)

### iii.     State Agency Medical Consultants

On August 16, 2017, state agency medical consultant Gerald Klyop, M.D. opined that Mr. Swain met the criteria for statutory blindness under listing 2.02, noting that his "distance and reading vision with best correction is all 20/400" at the consultative examination.  Tr. 123.

As part of an OQR (Office of Quality Review) evaluation on September 7, 2017, state agency medical consultant Jack E. Kundin, M.D. explained that the consultative examination showed that the vision in the left eye was 20/50-2, corrected to 20/40+1, and that there were other examination findings showing that Mr. Swain was not statutorily blind.  (Tr. 123-24.)  Dr.

Kundin opined that "[w]ith 20/40+1 vision in the better eye, vision is non-severe at 12 months post-AOD." (Tr. 124, 432.)  Thereafter, Dr. Klyop revised his initial determination, finding "no severe impairment related to vision." (Tr. 149, 162, 168.)

On reconsideration, on December 26, 2017, state agency medical consultant Lynne Torello, M.D., concluded that the evidence supported a finding of no severe impairment. (Tr. 175-76.)

## C.     Hearing Testimony

### 1.     Plaintiff's Testimony

#### i.     May 16, 2019 Hearing

At the first hearing, on May 16, 2019, Mr. Swain reported he had a driver's license but said he chose not to drive because he did not feel comfortable doing so. (Tr. 33-34, 56.)  He testified that he had more problems driving at night than during the day, stating "I just can't see at night period far distances." (Tr. 33.)  He also stated that his peripheral vision caused him problems driving during the day. (Tr. 34.)  He reported receiving approval from his doctor to return to work in 2018 "as long as [he] felt comfortable doing the work." (Tr. 35-36.)  He tried working at Rent-A-Center from May to late-July 2018, but stopped working there because he was making deliveries of household items and there came a point when his employer and he did not feel comfortable with him driving at night. (Tr. 36, 46.)  He then tried to work at a warehouse, but required emergency surgery due to glaucoma. (Tr. 36, 45-46.)  He last drove in 2018, when he was working for Rent-A-Center. (Tr. 35.)

When asked why he had been unable to work a full-time job since August 2016, the alleged onset date, Mr. Swain stated:

> Well my life changed, to be completely honest.  My vision is not the greatest.  I wish I could work.  I miss working every day.  I just, from being able to just not be

> able to see somebody's face standing right in front of you, calling your name.  Being able to like find certain stuff in front of you is, is very hard and I don't have no peripheral vision.  I can't even see the person sitting to the right of me, or to the left of me.  My friends always make jokes of like standing beside me, sneaking up on me, waving their hand, and I don't feel comfortable in the workplace.  I don't want to put nobody else at risk.  Even if I am working by myself, I don't want to put myself at risk of hurting or damaging someone else's property.  That's just me.  I would love to go back to work.  I miss it.  I'm not even active.  I don't play basketball no more.  It's hard to play catch with my daughter and my nieces and nephews.  I just, I just don't feel the same.

(Tr. 46-47.)  He testified that he moved back in with his parents after 2015 because he was unable to work and pay for his own place due to scheduled surgeries.  (Tr. 33.)  He reported that the vision in his left eye was "good, workable" following left corneal transplant but "then the pressure came."  (Tr. 47-48, 49, 53-54.)  He had a right corneal transplant in March 2018, but there was a bad cornea graft and he had to have the surgery redone.  (Tr. 48.)  He reported that he still had stitches in both his eyes that had not come out since his corneal transplants.  (Tr. 52, 55-56.)  He was restricted to lifting no more than twenty pounds because of the stitches.  (Tr. 61.)

Mr. Swain also testified that he had separate glaucoma tube surgeries in both eyes to try to correct his abnormal eye pressure, and he also anticipated needing cataract surgery because of blurry vision in his right eye.  (Tr. 48-50.)  The glaucoma tube surgery in the right eye was performed on an emergency basis in October 2018.  (Tr. 49-50.)  He reported that the tubes were initially helpful, but that the pressure was still high.  (Tr. 50.)  His doctors continued to check and monitor the pressure.  (*Id.*)  He testified that he was still recovering from his 2018 right eye surgery and his April 2019 left eye surgery.  (Tr. 34, 51.)

Mr. Swain explained that he had good and bad vision days.  (Tr. 54.)  How good or how bad depended upon the extent of blurriness in his eyes.  (Tr. 54-55.)  He attributed the blurriness to the fact that his corneas were still healing.  (Tr. 55.)  He said he was told that they should heal "anywhere from 4 to 12 months," but that he "still [had] stitches in [his] eyes."  (*Id.*)

Mr. Swain testified that he no longer played basketball because he could not see the rim to shoot or catch the ball.  (Tr. 56.)  He reported that playing video games was a large part of his life, but that he no longer played them because it was hard for him to see or focus.  (*Id.*)  He watched television, but whether he could see depended on where he was sitting.  (*Id.*)  His five-year-old daughter lived with her mother.  (Tr. 57.)  When Mr. Swain saw his daughter, his mother helped him take care of her.  (Tr. 57.)  He reported being worried he would "lose sight of her or something" if he was the only one watching her.  (*Id.*)  He testified that his mom and dad drove him when he needed to go shopping.  (*Id.*)  He reported doing his own laundry, trying to help with cleaning around the house, and cooking sometimes (usually microwaveable food).  (Tr. 57-58.)  He stated he did not perform yardwork because he would get dust in his eyes, which could be irritating.  (Tr. 58, 62.)  Indoor dust could also be irritating.  (Tr. 62-63.)  When asked whether changes in the weather affected his eyes, he said he could not get his eyes wet.  (Tr. 63.)  He was able to take a shower, but had to be careful when washing his hair or face.  (*Id.*)  He indicated he was not on his phone often because the lights were too bright.  (Tr. 58-59.)  It was hard for him to focus to read, but he used a tablet for about an hour or so a day to access social media.  (Tr. 59-60.)  He enjoyed coloring and did so frequently.  (Tr. 59.)

### ii.     September 2020 Hearing

At his second hearing, on September 17, 2020, Mr. Swain testified that he had his driver's license, but still chose not to drive because he was not comfortable doing so due to his vision problems.  (Tr. 89-91.)  He explained "My whole life has changed due to the vision loss." (Tr. 90.)  When asked why he felt he could not work full-time, Mr. Swain stated:

> I do want to work to be completely honest.  It's just like in certain situations at work like I feel, once I start working and I get into the groove of stuff, soon as immediately like as you get comfortable, like my vision gets blurry or my eye start itching and it turns red and then immediately everybody thinks I'm intoxicated or,

it's, it's just weird, and it's hard to deal with not being able to visualize the little things like if I'm just picking up something I might be, or something falls out of my hand or at work, or it's hard to find, like I can't see the little things that matter to me, like somebody could call my name and I'm, I don't even look up because I can't see from far distances.  I can't make out faces, and I don't know who that person is off of a voice, or a sound, or if somebody tells me to go look for something, it happened multiple times at the salvage yard that it was sitting right there where they said it was, but I never found it.  It's, I don't know if I, if I'm, if I'm not taking my time to look for it or, it just doesn't seem right.  I want to go back to work.  I actually love working, that's why I never not went without a job.

(Tr. 94.)  Mr. Swain testified that he had "better vision in [his] left eye after four years of surgery."  (Tr. 95.)  He stated that his "left eye seem[ed] fine" and had no complaints with his left eye, adding he "just wish[ed] his right eye [would] get like [his] left eye, then it [would] be perfectly fine."  (Tr. 97.)

He reported that he did not feel like his vision had improved in his right eye, even though his records reflected improvement following cataract surgery in September 2019.  (Tr. 95.)  He explained that "it seem[ed] all better," when they did testing in the doctor's office, "but once they [took] the little eye visions off, [he] [couldn't], [he] [couldn't] see" anything.  (Tr. 95.)  He reported that his doctors told him glasses would not work, but wanted him to try contacts.  (Tr. 95.)  Due to scheduling issues and Covid-19, he never completed a fitting for contacts.  (Tr. 95-96.)  He was provided with a trial pair of contact lenses and reported they improved his vision but were very uncomfortable.  (Tr. 103.)  He explained that he could not wear them for more than a few hours.  (Tr. 104.)  He reported having no issues with walking around places, and did not bump into things or stumble over things, but had problems recognizing faces because they appeared blurry to him.  (Tr. 105.)  He said he could walk past someone he knew for years and not recognize the person.  (*Id*.)  He was able to read street signs during the day.  (Tr. 106.)

Mr. Swain reported that the stitches in his eyes had not yet been removed, so he was still under lifting restrictions from his doctor.  (Tr. 97.)  He could not recall if the lifting restriction was fifty or twenty pounds.  (*Id*.)

On a typical day, Mr. Swain reported that he would sit around the house, hang out with friends, watch television, and play video games.  (Tr. 98, 100, 102, 104.)  He liked to engage in physical activity, especially basketball, but did not have goggles and was concerned about getting poked in the eye.  (Tr. 98.)  He reported using a workout facility at times to walk or use the pool.  (Tr. 104-05.)  He only played basketball three or four times during the prior five or six years because he was afraid of reinjuring his eye or damaging his stitches.  (Tr. 99-100.)  He could read if the materials were up close, but preferred to listen to audio books.  (Tr. 99.)

Mr. Swain saw his seven-year-old daughter a few times each month.  (Tr. 100.)  He had stopped going grocery shopping due to the coronavirus.  (Tr. 100-01.)  Instead, he had groceries delivered.  (Tr. 101.)  He still went out to stores on occasion, but reported that he tried to limit the number of people he was around.  (Tr. 101-02.)   He did his own laundry and vacuumed on occasion.  (Tr. 102.)

## 2. Vocational Expert's Testimony – September 2020

At the September 2020 hearing, a Vocational Expert ("VE") testified.  (Tr. 107-14.)  The VE confirmed that Mr. Swain's past work was classified as follows: (1) driver porter, a medium exertional, unskilled job performed at light exertional level; (2) customer service representative, sedentary exertional, semi-skilled job; (3) piemaker, light exertional, skilled job; (4) labeler, light exertional, semi-skilled job; (5) salvager, medium exertional, unskilled job performed at heavy exertional level; and (6) rental clerk, light exertional, unskilled job performed at heavy exertional level.  (Tr. 92-93, 107-08.)

For her first hypothetical, the ALJ asked the VE to assume an individual Mr. Swain's age and with his education and work experience who:

> can perform medium work, and should not be required to perform tasks that require precise depth perception, such as threading a needle, or work that requires peripheral vision on the right.  He should avoid exposure to dangerous moving machinery, and unprotected heights, and should perform no commercial driving.

(Tr. 108.)  The VE testified that the described individual could perform Mr. Swain's past work as a customer service representative and piemaker as described in the DOT and as performed, and his past work as a rental clerk as described in the DOT but not as performed.  (Tr. 109.)  The VE also testified that the described individual could perform other jobs, including hand packager, production helper, and kitchen helper.  (Tr. 110.)

For her second hypothetical, the ALJ asked the VE to make the same assumptions as outlined in the first hypothetical, except the individual could perform light work.  (Tr. 111.)  The VE testified that the described individual could perform the same past jobs as identified in response to the first hypothetical, and could perform other jobs, including cleaner housekeeper, dining service worker, and sales attendant.  (*Id*.)

For her third hypothetical, the ALJ asked the VE whether his response to the first two hypotheticals would change if the individual was limited to occasional reading.  (Tr. 112.)  The VE testified that the customer service representative and rental clerk positions would not be available, but the piemaker and other jobs identified in response to the first and second hypothetical would remain.  (*Id*.)

For her fifth hypothetical, the ALJ asked the VE to consider the first two hypotheticals with the following additional limitations: working in an environment free of fast-paced production requirements or strict production quotas, and with only routine changes and work

24

tasks.  (Tr. 112.)  The VE testified that the past work would be eliminated but the light and medium jobs previously identified would remain.  (Tr. 113.)

The VE testified that usual tolerance for being off task was no more than ten percent of the time in addition to normal breaks and lunch and the usual tolerance for being absent was no more than one day per month up to twelve days per year.  (Tr. 113.)

### III.    Standard for Disability

Under the Social Security Act, 42 U.S.C § 423(a), eligibility for benefit payments depends on the existence of a disability.  Disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A). Furthermore:

> [A]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . .

42 U.S.C. § 423(d)(2).

In making a determination as to disability under this definition, an ALJ is required to follow a five-step sequential analysis set out in agency regulations.  The five steps can be summarized as follows:

1.    If the claimant is doing substantial gainful activity, he is not disabled.

2.    If the claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.

3.    If the claimant is not doing substantial gainful activity, is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed

impairment, the claimant is presumed disabled without further inquiry.

4.    If the impairment does not meet or equal a listed impairment, the ALJ must assess the claimant's residual functional capacity and use it to determine if the claimant's impairment prevents him from doing past relevant work.  If the claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.

5.    If the claimant is unable to perform past relevant work, he is not disabled if, based on his vocational factors and residual functional capacity, he is capable of performing other work that exists in significant numbers in the national economy.

20 C.F.R. § 404.1520;416.920;[1]  *see also Bowen v. Yuckert*, 482 U.S. 137, 140–42, 107 S. Ct. 2287, 96 L. Ed. 2d 119 (1987).  Under this sequential analysis, the claimant has the burden of proof at Steps One through Four.  *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997).  The burden shifts to the Commissioner at Step Five to establish whether the claimant has the Residual Functional Capacity ("RFC") and vocational factors to perform other work available in the national economy.  *Id.*

## IV.    The ALJ's Decision

In her October 29, 2020 decision, the ALJ made the following findings:[2]

1.    The claimant meets the insured status requirements through March 31, 2019.  (Tr. 12.)

2.    The claimant has not engaged in substantial gainful activity since August 22, 2016, the alleged onset date.  (Tr. 12-13.)

3.    The claimant has the following severe impairments: bilateral primary open angle glaucoma and keratoconus, status-post bilateral corneal transplants, with failure of right corneal transplant; revision surgery; bilateral glaucoma tube placement; and adjustment disorder with anxiety and depressed mood. (Tr. 13.)

---

[1] The DIB and SSI regulations cited herein are generally identical.  Accordingly, for convenience, in most instances, citations to the DIB and SSI regulations regarding disability determinations will be made to the DIB regulations found at 20 C.F.R. § 404.1501 et seq.  The analogous SSI regulations are found at 20 C.F.R. § 416.901 et seq., corresponding to the last two digits of the DIB cite (i.e., 20 C.F.R. § 404.1520 corresponds with 20 C.F.R. § 416.920).

[2] The ALJ's findings are summarized.

4.     The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of the listed impairments.  (Tr. 13-14.)

5.     The claimant has the residual functional capacity to perform medium work as defined in 20 C.F.R. § 404.1567(c) except that he cannot perform tasks which require precise depth perception, or peripheral vision on the right; and he should avoid exposure to dangerous moving machinery, unprotected heights, and cannot perform commercial driving. He can work in an environment which is free of fast-paced production requirements or strict production quotas; and he can tolerate only routine changes in work tasks.  (Tr. 14-18.)

6.     The claimant is unable to perform any past relevant work.  (Tr. 18.)

7.     The claimant was born in 1990 and was 25 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date. (*Id.*)

8.     The claim has at least a high school education.  (*Id.*)

9.     Transferability of job skills is not an issue because claimant's past work was unskilled.  (*Id.*)

10.    Considering the claimant's age, education, work experience, and RFC, there are jobs that exist in significant number in the national economy that he can perform such as hand packager, production helper, and kitchen helper. (Tr. 18-19.)

Based on the foregoing, the ALJ determined that Mr. Swain had not been under a disability from August 22, 2016, through the date of the decision.  (Tr. 19.)

## V.     Plaintiff's Arguments

Although represented during the administrative proceedings, Mr. Swain filed this appeal *pro se*.  It is well-settled that "inartfully pleaded allegations in a *pro se* complaint are held to less stringent standards than formal pleadings drafted by lawyers." *Franklin v. Rose*, 765 F.2d 82, 84–85 (6th Cir.1985) (internal quotation marks omitted) (*citing Haines v. Kerner*, 404 U.S. 519, 520, 92 S. Ct. 594, 30 L. Ed. 2d 652 (1972)).  Because the allegations in *pro se* pleadings are entitled to "liberal construction," *id.*, the undersigned construes Mr. Swain's Complaint and Brief

27

as raising the following assignments of error: (1) the ALJ's Step Three and Four findings are not supported by substantial evidence; and (2) a sentence six remand is necessary in light of additional records provided after the ALJ's decision. (ECF Doc. 1, ECF Doc. 9, ECF Doc. 10.)

## VI.    Law & Analysis

### A.    Standard of Review

A reviewing court must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record. *See Blakley v. Comm'r Of Soc. Sec.*, 581 F.3d 399, 405 (6th Cir. 2009) ("Our review of the ALJ's decision is limited to whether the ALJ applied the correct legal standards and whether the findings of the ALJ are supported by substantial evidence.").

When assessing whether there is substantial evidence to support the ALJ's decision, the Court may consider evidence not referenced by the ALJ. *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001). "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Hum. Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992) (quoting *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989)); *see also Blakley*, 581 F.3d at 406. The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)).

"'The substantial-evidence standard ... presupposes that there is a zone of choice within which the decisionmakers can go either way, without interference by the courts.'" *Blakley*, 581 F.3d at 406, *quoting Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986)). Therefore, a court

"may not try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility." *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).  Even if substantial evidence supports a claimant's position, a reviewing court cannot overturn the Commissioner's decision "so long as substantial evidence also supports the conclusion reached by the ALJ."  *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003); *Blakley*, 581 F.3d at 406 ("[I]f substantial evidence supports the ALJ's decision, this Court defers to that finding 'even if there is substantial evidence in the record that would have supported an opposite conclusion.'") (quoting *Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997)).

Even where an ALJ decision is supported by substantial evidence, the Sixth Circuit explains that the "'decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.'"  *Rabbers v. Comm'r Soc. Sec. Admin.*, 582 F.3d 647, 651 (6th Cir. 2009) (quoting *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2007); citing *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 546–547 (6th Cir. 2004))); *see also Rabbers*, 582 F.3d at 654 ("Generally, … we review decisions of administrative agencies for harmless error."). A decision will not be upheld if the Commissioner's reasoning does not "build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996)).

**B.**    **First Assignment of Error: Whether Step Three and Step Four Findings were Supported by Substantial Evidence**

In support of his August 9, 2021 appeal, Mr. Swain argued:

They didn't look at what the doctor said, and the facts of my case.  I am wors[e] now than I was in 2017 which I was awarded disability, then and then denied right after that.

> I don't know all the legal error in my court case[.]  I am not a lawyer.  [T]hat my
> reason for the next level of the justice system to look at my case[.]

(ECF Doc. 1 p. 4.)  His discussion of being "awarded disability" in 2017 appears to reference the

initial state agency favorable determination that was reversed through a corrective action in

September 2017.  (*See* Tr. 123, 127, 136, 140, 149-50, 162-63, 432-33.)   In a letter attached to

the appeal, he further addressed his concerns as follows:

> [W]hy was I approved and then denied[] after that.  I am now in wost condinited
> [sic] now than in 2017.  I have had 8 eyes surgeries and still cannot see well
> enoug[h] to work.

(ECF Doc. 1-2 p. 7.)  His letter brief provided further argument that his eye impairments

supported an award of disability, stating "I lost my eye site [sic] and life was never the same,"

and noting that he was "having a hard time to see" despite "3 differ[e]nt doctors and 7 eye

surgery," and found it "hard to focus my vision and see at night."  (ECF Doc. 9 p. 1.)

Liberally construing Mr. Swain's arguments on appeal, the undersigned finds he has

raised the following substantive grounds for reviewing the ALJ decision: (1) whether the ALJ

should have approved his claim in light of the initial state agency determination granting

benefits; (2) whether the ALJ erred in finding that Mr. Swain's vision impairments did not

satisfy a listing at Step Three of the sequential analysis; and (3) whether the RFC is supported by

substantial evidence at Step Four of the sequential analysis.[3]

### 1.    Whether ALJ Should Have Approved Benefits in Light of Initial State
    Agency Determination that Mr. Swain Met Criteria for Statutory Blindness

First and foremost, Mr. Swain questions why the initial state agency determination

granting him benefits in 2017 was later reversed through a corrective action.  (ECF Doc. 1 p. 4,

---

[3] To the extent Mr. Swain intended to raise additional substantive arguments on appeal, they were raised in a
perfunctory manner, without developed or clearly articulated argument, and are therefore deemed waived.  *See*
*McPherson v. Kelsey*, 125 F.3d 989, 995–96 (6th Cir. 1997).

ECF Doc. 1-2 p. 7.)  A review of the administrative record reveals that the initial determination of statutory blindness was based on a medical consultant's conclusion that Listing 2.02 was satisfied, but that the favorable determination was later reversed based on a second medical consultant's review of the record.  (123-24, 127-28, 162, 168, 432.)  The undersigned will therefore consider whether that initial favorable determination supports or requires a finding that the ALJ erred in denying benefits.

A claimant will be found to have statutory blindness if his "visual disorder meets the criteria of 2.02 or 2.03A.[4]  20 C.F.R. § Pt. 404, Subpt. P, App. 1.  Listing 2.02 covers loss of central visual acuity and requires a claimant to demonstrate that his "[r]emaining vision in the better eye after best correction is 20/200 or less."  20 C.F.R. § Pt. 404, Subpt. P, App. 1.

On August 16, 2017, state agency medical reviewer Gerald Klyop, M.D. concluded that Mr. Swain's vision impairments met Listing 2.02.  (Tr. 123.)  This conclusion was based in part on Dr. Klyop's observation that the consultative examination of August 2017 showed Mr. Swain's "[c]urrent distance and reading vision with best correction is all 20/400."  (Tr. 123.)  Based on these findings, the state agency made an initial determination that Mr. Swain met the criteria for disability based on statutory blindness.[5]  (Tr. 127-28.)  However, that initial determination was reversed through a corrective action shortly thereafter.

On September 7, 2017, as part of an OQR Pre-effectuation Review (PER), state agency medical reviewer Jack E. Kundin, M.D. reviewed the record and disagreed with Dr. Klyop's determination that Mr. Swain met Listing 2.02.  (Tr. 123-24, 136-37.)  While Dr. Kundin agreed

---

[4] Listing 2.03A is not pertinent to this discussion since the only listing the state agency initially found met was Listing 2.02.

[5] Mr. Swain attached a Notice of Award letter dated September 22, 2017 and Notice of Change in Payment letter dated October 20, 2017 to his appeal.  (ECF Doc. 1-2 pp. 9-12.)  While these documents are not a part of the administrative record on appeal, they are consistent with the record evidence regarding this initial determination.

that the visual acuity in Mr. Swain's right eye was 20/400 at the consultative examination, he noted that visual acuity in Mr. Swain's left eye at that time "was 20/50-2, corrected to 20/40+1." (Tr. 124, 137.) This is consistent with the relevant report. (Tr. 607.) Dr. Kundin also noted that the record contained "numerous vision measurements showing that [Mr. Swain] is not stat[utorily] blind." (Tr. 124, 137 (citing Tr. 556-592).) The Hillcrest records referenced by Dr. Kundin do include numerous visual acuity measurements showing the vision in Mr. Swain's <u>better</u> eye (the left) was above 20/200, even without best correction. (*See* Tr. 561 (20/60-2), 567 (20/125), 571 (20/70-), 575 (20/100), 579 (20/100).) Given that Listing 2.02 requires a finding that the "vision in the <u>better</u> eye after best correction is 20/200 or less," 20 C.F.R. § Pt. 404, Subpt. P, App. 1 (emphasis added), Dr. Kundin accurately observed that the measurements indicated Mr. Swain was not statutorily blind under Listing 2.02. Based on this analysis, Dr. Kundin concluded: "With 20/40+1 in the better eye, vision is non-severe at 12 months post-AOD." (Tr. 124, 137.)

In light of Dr. Kundin's findings, the state agency took a corrective action and directed that Mr. Swain's disability paperwork be revised to reflect that all impairments were non-severe as of twelve months post-AOD. (Tr. 432-33.) A revised initial determination was then issued, with a new analysis from Dr. Klyop that included the following findings:

> Current distance and reading vision with best correction is 20/400 in Rt eye, but 20/50-2 in Lt eye, corrected to 40/40+1. Separate records show that Left eye vision is supported as better than 20/200.

(Tr. 149, 162.) Dr. Klyop concluded that these findings supported "no severe impairment related to vision." (*Id.*) The revised initial determination accordingly found Mr. Swain not disabled. (Tr. 153-54, 166-67.)

Pre-effectuation Reviews, like the one in Mr. Swain's case, are conducted by the SSA to meet statutory requirements.  *See* SSA POMS GN 04440.005.  As explained in the SSA Program Operations Manual (POMS), "Section 221(c) of the Act requires SSA to review at least 50 percent of favorable Title II and concurrent Title II/Title XVI initial and reconsideration determinations made by adjudicating components on a pre-effectuation basis." *Id*.; 42 U.S.C. § 421(c)(3) (addressing the Commissioner of Social Security's process for conducting review of determinations made by State agencies).  As part of that process, "the Commissioner of Social Security shall, to the extent feasible, select for review those determinations which the Commissioner of Social Security identifies as being the most likely to be incorrect."  42 U.S.C. § 421(c)(3)(B).

In Mr. Swain's case, the PER resulted in a request for corrective action.  (Tr. 432-33.) The Request for Corrective Action was based on a Group 1, Category 11 deficiency, which is the code used when "the determination [was based] on medical considerations alone (i.e., the impairment is not severe, or the impairment meets, medically equals, or functionally equals the listings)" but "the evidence does not support the . . . determination and an opposite determination is appropriate."  SSA POMS GN 04440.202.  As explained in the Request for Corrective Action, "DDS prepared a fully favorable, meets listing 2.02, medical allowance.  However, the evidence does not support a determination of severe impairments.  Therefore, the claim should be denied." (Tr. 432.)  This determination was noted by the ALJ during the first hearing when the ALJ explained to Mr. Swain:

> It's seems like your vision has just been changing during the period.  I, I know your, your attorney's probably discussed with you that the State Agency, for its initial and reconsideration reviews, found that you didn't have a severe impairment because they look at 12-month periods and they also consider if you have, you know at least one eye that's functioning but, and I want you to know the other eye, you can't see anything out of, they will not consider you disabled generally.

(Tr. 50-51.)

Thus, the answer to Mr. Swain's question – why was he initially approved for disability benefits and then denied – is that the initial determination finding him disabled was based on an incorrect reading of visual acuity test results contained in Dr. File's August 11, 2017 consultative examination report.  That determination was followed by an OQR Pre-effectuation Review.  (Tr. 432-33.)  The record suggests that the corrective action was taken with proper authority and in accordance with applicable law.  Furthermore, it is the ALJ's October 29, 2020 decision that is the final decision subject to review by this Court, and not the earlier determination by the state agency.  The ultimate issue for this Court is whether the ALJ's October 29, 2020 decision is supported by substantial evidence.  *See* 42 U.S.C. 405(g); 42 U.S.C. § 421(d).  There is nothing about the state agency corrective action that would support a finding of error on the part of the ALJ.  Accordingly, the undersigned turns to the question of whether the ALJ's findings were supported by substantial evidence.

### 2.      Whether Step Three Findings are Supported by Substantial Evidence

Mr. Swain argues: "I lost my eye[sight] and life was never the same," "I am having a hard time to see," it is "hard to focus my vision and see at night," and "I don't want to hurt myself or anyone else because of my eyes." (ECF Doc. 9 p. 1.)  The undersigned liberally construes these arguments as a challenge to the ALJ's Step Three finding that his vision impairment did not satisfy a listing.

At Step Three of the sequential evaluation process, a claimant will be found disabled if his impairment meets or equals one of the listings in the Listing of Impairments. 20 C.F.R. § 404.1520(a)(4)(iii).  The claimant bears the burden of establishing that his condition meets or equals a listing.  *Johnson v. Colvin*, No. 1:13CV-00134-HBB, 2014 WL 1418142, at *3 (W.D.

34

Ky. Apr. 14, 2014) (citing 20 C.F.R. §§ 404.1520(d), 416.920(d); *Buress v. Sec'y of Health & Hum. Servs.*, 835 F.2d 139, 140 (6th Cir. 1987)).  A claimant "must present specific medical findings that satisfy the various tests listed in the description of the applicable impairment or present medical evidence which describes how the impairment has such equivalency."  *Thacker v. Soc. Sec. Admin.*, 93 F. App'x 725, 728 (6th Cir. 2004).  An ALJ need not specifically articulate "every consideration that [goes] into [her] step three determination," and "there is no heightened articulation standard [at step three] where the ALJ's findings are supported by substantial evidence." *Bledsoe v. Barnhart*, 165 F. App'x 408, 411 (6th Cir. 2006).

Here, the ALJ considered Mr. Swain's vision impairment at Step Three but found that it did not meet or equal a listing.  (Tr. 13.)  The ALJ explained:

> No treating or examining physician has indicated findings that would satisfy the severity requirements of any listed impairment. In reaching the conclusion that the claimant does not have an impairment or combination of impairments that meet or medically equal a listed impairment, the undersigned also considered the opinion of the State Agency medical consultants who evaluated this issue at the initial and reconsideration levels of the administrative review process and reached the same conclusion (20 CFR 404.1527(1), 416.927(1) and Social Security Ruling 17-2p).
>
> Listing 2.02, Loss of central visual acuity, was reviewed and consider[ed]; however, the claimant's measured visual acuity in his better (left) eye has never been 20/200 or less. The criteria of Listing 2.04, Loss of visual efficiency, or visual impairment, in the better eye, was also reviewed. The records of evidence do not include a visual efficiency percentage at or below 20% after best correction, nor do they contain a visual impairment value of 1.00 or greater after best correction. The claimant testified that he is "legally blind," but that is not the standard upon which the Listings are based. There is insufficient evidence in the record to support a listing level visual limitation at any time during the relevant period of alleged disability.

(*Id*.)  While Mr. Swain has alleged that he is "legally blind," under Social Security regulations, a claimant will only be found to have statutory blindness if his "visual disorder meets the criteria of 2.02 or 2.03A."  20 C.F.R. § Pt. 404, Subpt. P, App. 1.

Listing 2.02 relates to loss of central visual acuity.  To satisfy Listing 2.02, a claimant must demonstrate that his "[r]emaining vision in the <u>better eye</u> after best correction is 20/200 or less."  20 C.F.R. § Pt. 404, Subpt. P, App. 1 (emphasis added).  Listing 2.03 relates to contraction of the visual field in the better eye.  To satisfy Listing 2.03A, a claimant must show "[c]ontraction of the visual field in the <u>better eye</u>, with . . . [t]he widest diameter subtending an angle around the point of fixation no greater than 20 degree."  (*Id*.)  The ALJ also considered Listing 2.04 which relates to "[l]oss of visual efficiency, or visual impairment, in the <u>better eye</u>," and involves calculations of visual acuity and visual field impairment values in the better eye.  20 C.F.R. § Pt. 404, Subpt. P, App. 1 , 2.04, 2.00A7d and 2.00A8d (emphasis added).

The medical records clearly reflect that Mr. Swain's left eye his better eye.  This is further supported by Mr. Swain's own testimony at the September 2020 hearing that his "left eye seem[ed] fine" and he had no complaints with his left eye, and even "wish[ed] his right eye [would] get like [his] left eye, then it [would] be perfectly fine."  (Tr. 97.)  Thus, the proper focus for review of the listing determination is on testing relative to the left eye.

Mr. Swain does not identify specific evidence to support a finding that his vision impairments satisfy the criteria of either Listing 2.02 or 2.03A, and the undersigned's independent review of the record does not reveal record evidence to support listing level severity.  With respect to Listing 2.02, the undersigned notes that shortly before and after Mr. Swain's corneal implant surgery on the left eye on September 27, 2016 (Tr. 585-86), his visual acuity without correction was 20/250.  (Tr. 556 (August 17, 2016), Tr. 563 (October 6, 2016).)  However, that was his visual acuity <u>without</u> correction, not his best corrected vision.  (*Id*.)  More importantly, Mr. Swain's visual acuity numbers in the left eye improved to a level of acuity above 20/200 following his corneal implant surgery, even without correction.  (*See, e.g.*, Tr. 571

36

(December 8, 2021 – left eye 20/70), Tr. 579 (February 27, 2019 – left eye 20/100), Tr. 712

(April 2, 2018 – left eye 20/40), Tr. 852 (September 28, 2018 – left eye 20/25), Tr. 860 (January

9, 2019 – left eye 20/30), Tr. 1081 (July 9, 2019 – left eye 20/40), Tr. 1171 (January 7, 2020 –

left eye 20/80-1), Tr. 1212 (May 20, 2020 – left eye 20/30+1).)  This was so despite the need for

an additional surgery on his left eye to address glaucoma on April 4, 2019.  (Tr. 999-1001.)

Considering the lack of evidence showing Mr. Swain's "vision in [his] better eye after best

correction [was] 20/200 or less," the undersigned finds no basis upon which to find that the ALJ

erred in finding Listing 2.02 was not met.

Although the ALJ did not specifically discuss Listing 2.03A in her Step Three analysis,

"neither the listings nor the Sixth Circuit require the ALJ to 'address every listing' or 'to discuss

listings that the applicant clearly does not meet.'" *Smith-Johnson v. Comm'r of Soc. Sec.*, 579 F.

App'x 426, 432 (6th Cir. 2014) (internal citations omitted).  Here, a review of the record does not

reveal evidence of problems with the visual field in his left eye.  In fact, the record evidence

demonstrates that his visual field in the left eye was full.  This was true even prior to the corneal

transplant surgery in the left eye.  For example, on August 17, 2016, he had full visual fields in

both eyes.  (Tr. 557.)  His visual fields in both eyes were full during other testing, including on

April 2, 2018, July 3, 2018, January 7, 2020, February 12, 2020, and May 20, 2020.  (Tr. 712-13,

820, 1171, 1208, 1212.)  While his visual field in the right eye was very blurry on May 2, 2018,

there is no indication that there was a problem with the visual field in his left eye.  (Tr. 726.)

Considering the record and Mr. Swain's failure to demonstrate that "the record raises 'a

substantial question as to whether [he] could qualify as disabled' under a listing," *Smith-*

*Johnson*, 579 F. App'x at 432, the undersigned finds that the ALJ's lack of specific reference to

Listing 2.03A at Step Three was not error.

The undersigned also finds no error with the ALJ's finding that Listing 2.04 was not satisfied. The criteria under Listing 2.04 involve calculations based on visual acuity and visual field impairment values in the better eye. *See* Listing 2.04, 2.00A7d and 2.00A8d. Mr. Swain has not identified record evidence suggesting that the ALJ incorrectly found that the "records of evidence do not include a visual efficiency percentage a visual efficiency percentage at or below 20% after best correction, nor do they contain a visual impairment value of 1.00 or greater after best correction." (Tr. 13.)

Even though he is proceeding *pro se*, the burden at Step Three rests with Mr. Swain. *Johnson*, 2014 WL 1418142, at *3. The undersigned finds that Mr. Swain has failed to satisfy his burden to demonstrate that his vision impairments rise to listing level severity. He has not presented "specific medical findings that satisfy" the criteria of the vision listings and he has not "present[ed] medical evidence which describes how the impairment has such equivalency." *See Thacker*, 93 F. App'x at 728. His subjective statements, including "I lost my eye[sight] and life was never the same," "I am having a hard time to see," it is "hard to focus my vision and see at night," and "I don't want to hurt myself or anyone else because of my eyes," are not specific medical findings and do not serve to establish the criteria under the listings. The ALJ considered the record evidence and properly relied upon the state agency medical consultants' opinions as support for his Step Three finding that Mr. Swain's visual impairments did not meet or equal a listing. (Tr. 13.) The undersigned accordingly finds the ALJ's Step Three finding was supported by substantial evidence, and Mr. Swain has not met his burden to show otherwise.

### 3. Whether RFC is Supported by Substantial Evidence at Step Four

Mr. Swain also argues that he should be found disabled because he has received treatment from multiple eye doctors and had multiple eye surgeries. (ECF Doc. 9 p. 1.) In

38

addition, he contends that the ALJ "didn't look at what the doctor said, and the facts of [his] case," and that he is worse now than he was in 2017.  (ECF Doc. 1 p. 4.)  The undersigned liberally construes these arguments as a challenge to the ALJ's RFC finding at Step Four.

A claimant's "residual functional capacity is the most [he] can still do despite [his] limitations."  20 C.F.R. § 404.1545(a)(1).  "The responsibility for determining a claimant's residual functional capacity rests with the ALJ, not a physician."  *Poe v. Comm'r of Soc. Sec.*, 342 F. App'x 149, 157 (6th Cir. 2009) (citing See 20 C.F.R. §§ 404.1546(c), 416.946(c)).  An ALJ assesses a claimant's "residual functional capacity based on all the relevant evidence in [the] case record."  20 C.F.R. § 404.1545(a)(1).

As a general matter, it is well-established that the ALJ was not required to accept Mr. Swain's subjective allegations as true or incorporate them into the RFC.  *See Jones*, 336 F.3d at 476 ("[A]n ALJ is not required to accept a claimant's subjective complaints.").  The ALJ did consider Mr. Swain's subjective allegations, but found they were not entirely consistent with the medical and other evidence of record. (Tr. 15.)  In particular, the ALJ considered objective medical evidence, including visual acuity testing, which showed improvement over time with surgical intervention.  (Tr. 17 (citing Tr. 607-11, 1081, 1212).)  She considered evidence from an ophthalmological visit in February 2020 which showed that Mr. Swain's "visual acuity [was] stable and functional."  (Tr. 16 (citing Tr. 1209).)  At that February 12, 2020 ophthalmological appointment, visual acuity in Mr. Swain's non-dominant eye – the right eye – was 20/30 with contacts and his visual fields were full.  (Tr. 1208.)  She considered evidence of non-compliance with medication, which necessitated warnings from medical providers of the risks associated with non-compliance.  (Tr. 16 (citing Tr. 1252-53, 1256).)  She also considered evidence that

Mr. Swain reported difficulty reading in 2019, but later testified that he was able to read books and letters, watch television, and play video games without issue.  (Tr. 16, 98, 99, 982.)

Contrary to Mr. Swain's claim that the ALJ "didn't look at . . . the facts of [his] case," (ECF Doc. 1 p. 4), the record does not support a finding that the ALJ disregarded evidence.  She considered Mr. Swain's treatment history, including his multiple eye surgeries.  (Tr. 16.)  She acknowledged that he was "diagnosed with keratoconus in both eyes, and he underwent multiple surgeries, including cornea transplant, to improve his visual acuity."  (*Id*.)  She considered the evidence showing that he required additional surgeries to address glaucoma, and acknowledged that he suffered "primary graft failure" after the corneal transplant of his right eye, but also noted that subsequent treatment records reflected that the "rejection (was) improving."  (Tr. 16 (citing Tr. 632, 742, 866, 971, 1258).)  Despite Mr. Swain's need for multiple surgeries, the ALJ observed that he requested a letter from his physician stating that he could operate a tow motor in March 2017, "implying that he felt his vision was good enough that it allowed him to perform work activity as of that date." (Tr. 16 (citing Tr. 614).)  It was only after her consideration of the longitudinal record, including the multiple surgeries, that the ALJ found Mr. Swain's "vision began the relevant period as impaired, but functional, and his surgeries have markedly improved his vision, and thus his functional ability."  (Tr. 17.)  A review of both the ALJ decision and the underlying record reveals that these findings are supported by substantial evidence.

Contrary to Mr. Swain's claim that the ALJ "didn't look at what the doctors said," (ECF Doc. 1 p. 4), it is clear that the ALJ did consider what medical providers said about his vision impairments.  The ALJ considered Dr. Wagenberg's February 2019 opinion that Mr. Swain would "be unable to work until [his glaucoma surgery] [was] complete," but found it unpersuasive because it was a short-term restriction and a legal conclusion beyond Dr.

40

Wagenberg's field of expertise.  (Tr. 16, 632.)  The ALJ considered Dr. Wagenberg's April 2019 opinion that Mr. Swain would require follow up every three months, had limited/poor vision, and did not need breaks but would miss work approximately once a month.  (Tr. 16, 908-09.)  She found the opinion "not persuasive because the records specifically indicate that the claimant requires follow-up every three months, and there is no other evidence which supports that he would miss work more often."  (Tr. 16.)  It is noted that Dr. Wagenberg also opined in April 2019 that Mr. Swain had not been compliant with taking his medication and would not need any special accommodations due to his vision.  (Tr. 908.)

The ALJ also considered the opinion of consultative examiner Dr. File, who opined that Mr. Swain "should not drive *at nite* (sic), climb heights, or operate heavy machinery."  (Tr. 16 (citing 607-11) (emphasis in ALJ decision).)  The ALJ noted that Dr. File did not impose any restrictions on daytime driving, nor any other restrictions.  (Tr. 16.)  The ALJ concluded that Dr. File's opinion was partially persuasive because:

> [T]here is sufficient support in the longitudinal record, including subsequent vision evaluations, that the claimant should not perform tasks which require precise depth-perception or peripheral vision, as the claimant testified, and his record corroborate, that his right eye vision is impaired, while his left eye vision is corrected to relatively normal function. The undersigned concurs that the claimant should avoid exposure to dangerous moving machinery, or unprotected heights, but in consideration of the claimant's testimony that he is not comfortable driving a vehicle, he should not perform commercial driving.

(Tr. 16.)  Additionally, the ALJ considered the opinions of the state agency medical consultants, finding them not persuasive to the extent that they concluded that the evidence did not support any severe impairments.  (*Id.*)

Based on a review of the ALJ's decision as a whole, it is clear that the ALJ did consider medical opinions and appropriately explained the extent to which she found the opinions to be persuasive or not persuasive.  A review of the decision also makes it clear that the ALJ did not

fail to account for limitations associated with Mr. Swain's vision impairments.  The ALJ specifically found that Mr. Swain had the RFC to perform medium work with the following additional limitations:

> [H]e cannot perform tasks which require precise depth perception, or peripheral vision on the right; and he should avoid exposure to dangerous moving machinery, unprotected heights, and cannot perform commercial driving.  He can work in an environment which is free of fast-paced production requirements or strict production quotas; and he can tolerate only routine changes in work tasks.

(Tr. 14.)  Mr. Swain has not demonstrated that this RFC fails to account for the limitations associated with his vision impairments, or that it lacks the support of substantial evidence.

The court "may not try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility."  *Garner*, 745 F.2d at 387.  Even if substantial evidence supports a claimant's position, a reviewing court cannot overturn the Commissioner's decision "so long as substantial evidence also supports the conclusion reached by the ALJ."  *Jones*, 336 F.3d at 477.  As recently explained by the Sixth Circuit:

> [A]t issue in social security cases is not whether [the court] would have reached the same decision on [the] record.  When determining whether to affirm the Commissioner's decision, [the court] need not "agree with the Commissioner's finding"; [the court] instead ask[s] whether the decision followed legal standards and "is substantially supported in the record."

*Bowers, v. Comm'r of Soc. Sec.*, No. 21-4069, 2022 WL 1277703, at *1 (6th Cir. Apr. 29, 2022) (citing *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007)).)  Here, although Mr. Swain continued to report vision problems and required multiple surgeries, he has not demonstrated that the ALJ's finding that his vision impairments were not entirely disabling lacked adequate explanation or was unsupported by substantial evidence.  Further, Mr. Swain has not demonstrated that the ALJ failed to follow the appropriate legal standards or that the RFC lacked the support of substantial evidence.

For all of the reasons stated above, the undersigned finds no basis to remand this matter for further evaluation of Mr. Swain's vision impairments or further articulation of the RFC.

**C.** **Second Assignment of Error: Whether A Sentence Six Remand Is Necessary in Light of Additional Records**

Mr. Swain has filed various records in connection with his appeal, including a CD containing letters sent by the attorney who represented him at the administrative level, documents from the administrative record, a pharmacy record, MyChart records, and a printout of SNAP monthly benefit payments. (ECF Doc. 1, ECF Doc. 1-2, ECF Doc. 1-3.)  He also attached portions of the administrative record and a letter from his mother to his Brief.  (ECF Doc. 9, ECF Doc. 9-1, ECF Doc. 9-2.)  He later supplemented his Brief with a December 27, 2021 letter from Dr. Wagenberg.  (ECF Doc. 10, ECF Doc. 10-1, ECF Doc. 12.)  Considering his *pro se* status, the undersigned has broadly construed the submission of these external documents as a request to remand the case for the consideration of additional evidence.

The Sixth Circuit explains that "where the Appeals Council considers new evidence but declines to review a claimant's application for disability insurance benefits on the merits, the district court cannot consider that new evidence in deciding whether to uphold, modify, or reverse the ALJ's decision," and can only consider it as the basis for a sentence six remand. *Cline v. Comm'r of Soc. Sec.*, 96 F.3d 146, 148 (6th Cir. 1996).  There are two kinds of remand under Section 405(g): a "sentence four remand" made in connection with a judgment affirming, modifying, or reversing the commissioner's decision; and a "sentence six remand" where the court makes no substantive ruling as to the correctness of the Commissioner's decision.  *See Melkonyan v. Sullivan*, 501 U.S. 89, 97–101, 111 S. Ct. 2157, 2163–64, 115 L. Ed. 2d 78 (1991); *see also Hollon v. Commissioner*, 447 F.3d 477, 486 (6th Cir. 2006).  This Court is not permitted to consider evidence that was not submitted to the ALJ in the sentence four context, but can

consider such evidence to determine whether a sentence six remand is appropriate.  *See Bass v. McMahon*, 499 F.3d 506, 513 (6th Cir. 2007); *Foster v. Halter*, 279 F.3d 348, 357 (6th Cir. 2001).

To justify remand under sentence six, Mr. Swain must demonstrate that the evidence he now presents in support of a remand is "new" and "material," and that there was "good cause" for her failure to present this evidence in the prior proceedings.  *See Hollon*, 447 F.3d at 483; *see also Ferguson v. Comm'r of Soc. Sec.*, 628 F.3d 269, 276–278 (6th Cir. 2010) (although the evidence that the claimant sought to introduce was "new," the claimant failed to meet her burden of showing "good cause" for failure to submit the evidence and that the evidence was "material").  Evidence is new "only if it was not in existence or available to the claimant at the time of the administrative proceeding."  *Ferguson*, 628 F.3d at 276 (internal quotations and citations omitted).  Evidence is material "only if there is a reasonable probability that the Secretary would have reached a different disposition of the disability claim if presented with the new evidence."  *Id.*  (internal quotations and citations omitted).  "A claimant shows good cause by demonstrating a reasonable justification for the failure to acquire and present the evidence for inclusion in the hearing before the ALJ."  *Id.*  (internal quotations and citations omitted).

A review of the records submitted by Mr. Swain demonstrate that the above standard has not been met.  First, the portions of records from the underlying administrative proceedings that Mr. Swain submitted are plainly not "new" and therefore not a basis for a sentence six remand.  Furthermore, as discussed above, Mr. Swain has not shown that the ALJ failed to consider records which were part of the underlying administrative proceedings.

Second, the CD filed along with the Complaint contains five letters authored by Mr. Swain's counsel in the underlying administrative proceedings.  Three of the letters are addressed

to Mr. Swain and pertain to the status of his disability proceedings.  One letter is to the Appeals Council seeking an update as to the status of Mr. Swain's appeal to the Appeals Council and the other letter is to the ALJ asking that the hearing be held by telephone.  These letters are procedural in nature.  They are not "material" under the standard set forth above as is required to establish a basis for a sentence six remand.

Third, the pharmacy record is an itemized statement of prescriptions sold to Mr. Swain from August 2, 2019 through August 19, 2020, a time period which pre-dates the ALJ's October 29, 2020 decision in this matter.  Thus, these records are not "new," and Mr. Swain has not demonstrated that the records are "material."  Furthermore, even if deemed "new" or "material," he has not shown "good cause" for not submitting the pharmacy record as part of the underlying proceedings as is required to establish a basis for a sentence six remand.

Fourth, the MyChart records consist of various test results and prescriptions, including some vision-related tests.  However, with the exception of one prescription for eye drops for the right eye dated December 3, 2020, the tests and prescriptions pre-date the ALJ's October 29, 2020 decision.  Thus, even if "material," the bulk of records are not "new."  Additionally, there has been no showing of "good cause" for not submitting the MyChart record as part of the underlying proceedings as is required to establish a basis for a sentence six remand.

Fifth, the printout of SNAP monthly benefit payments shows benefit payments made prior to the ALJ's October 29, 2020.  Even if there was some basis for arguing that evidence of monthly SNAP benefits is "material," the evidence is not "new" and there has been no showing of "good cause" for not submitting the printout as part of the underlying proceedings as is required to establish a basis for a sentence six remand.

Sixth, there is a December 27, 2021 letter from Mr. Swain's mother, Yolanda Swain, attached to his brief.  (ECF Doc. 9-1.)  Ms. Swain's statements in her letter are generally duplicative of statements already contained in the record or Mr. Swain's own brief.  For example, she recounts her son's multiple eye surgeries, the difficulty and frustration that her son and his family have had because of his vision impairments, and she expresses their lack of understanding as to why her son was approved for disability in 2017 and then disapproved.  This information is not "new" or "material" under the standards set forth above.  Additionally, as with the other materials, there has been no showing of "good cause" for not submitting the record as part of the underlying proceedings as is required to establish a basis for a sentence six remand.

Finally, Mr. Swain attached a December 27, 2021 letter from Dr. Wagenberg providing an update on Mr. Swain's ophthalmic condition.  Dr. Wagenberg states:

> [Mr. Swain] is a 31 year old male who has a history of severe Primary open angle glaucoma status post glaucoma shunt surgery, muscle repair, and corneal transplants.  Recently, he had a corneal ulcer of the left eye which has since improved.
>
> On examination patient had a corrected vision of 20/70 in the right eye and 20/30 in the left eye.  Ophthalmic examination was remarkable for bilateral corneal grafts.  He has pressure of 16 in the right eye and 9 in the left eye.  He had a reduced visual field in both eyes.  He has bilateral optic nerve cupping.
>
> In conclusion, Kevin Swain has decrease in his visual field and vision which makes it difficult to drive and obtain work.

(ECF Doc. 10-1.)   While this letter is "new" evidence, the undersigned does not find it "material."  The letter does not indicate that the examination findings relate back to the relevant period.  Further, while Dr. Wagenberg reported that Mr. Swain's visual field was decreased, the reduction is not quantified.  Dr. Wagenberg did not opine that Mr. Swain could not drive or work.  He stated only that his vision made it difficult to do so.  Additionally, as discussed above, the ALJ did not ignore the visual impairments.  Indeed, the RFC provides that Mr. Swain

46

"cannot perform tasks which require precise depth perception, or peripheral vision on the right; and he should avoid exposure to dangerous moving machinery, unprotected heights, and cannot perform commercial driving."  (Tr. 14.)  He was also limited to "work in an environment which is free of fast-paced production requirements or strict production quotas; and be can tolerate only routine changes in work tasks."  (*Id*.)  To the extent that the December 27, 2021 letter is intended as evidence of a worsening condition, it is well established that a sentence six remand is not appropriate to consider evidence that a claimant's condition worsened after the administrative hearing.  *Walton v. Astrue*, 773 F. Supp. 2d 742, 753 (N.D. Ohio 2011) (citing *Wyatt v. Sec'y of Health & Human Servs.*, 974 F.2d 680, 685 (6th Cir. 1992)).  If Mr. Swain's condition seriously worsened after the administrative hearing, an appropriate remedy would be the initiation of a new claim for benefits as of the date that his condition rose to the level of a disabling impairment.  *Sizemore v. Sec'y of Health & Hum. Servs.*, 865 F.2d 709, 712 (6th Cir. 1988).

Upon review of Mr. Swain's late-submitted evidence, the undersigned finds the evidence is either not "new" and/or not "material."  Additionally, there has been no showing of "good cause" for the failure to timely submit the evidence.  While Mr. Swain is *pro se* in this appeal, he was represented by counsel at the administrative level.  Thus, the undersigned concludes that his *pro se* status does not explain or establish "good cause" for late submission of records.  For the reasons explained here, the undersigned finds this assignment of error is without merit.

### VII.    Recommendation

For the foregoing reasons, the undersigned recommends that the Court **AFFIRM** the

Commissioner's decision.

July 8, 2022                                         */s/ Amanda M. Knapp*
                                                      AMANDA M. KNAPP
                                                      UNITED STATES MAGISTRATE JUDGE

### <u>OBJECTIONS</u>

Any objections to this Report and Recommendation must be filed with the Clerk of
Courts within fourteen (14) days after being served with a copy of this document.  Failure to file
objections within the specified time may forfeit the right to appeal the District Court's order.  *See
Berkshire v. Dahl*, 928 F.3d 520, 530 (6th Cir. 2019); *see also Thomas v. Arn*, 474 U.S. 140
(1985).